# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| (1) TIMOTHY POH,<br>Derivatively on Behalf of<br><br>CHESAPEAKE ENERGY CORPORATION,<br>Plaintiff,<br><br>v.<br><br>(1) AUBREY K. MCCLENDON,<br>(2) BOB G. ALEXANDER,<br>(3) ARCHIE W. DUNHAM,<br>(4) V. BURNS HARGIS,<br>(5) VINCENT J. INTRIERI,<br>(6) R. BRAD MARTIN,<br>(7) MERRILL A. "PETE"MILLER, JR.,<br>(8) FREDERIC M. POSES,<br>(9) LOUIS A. SIMPSON,<br>(10) RICHARD K. DAVIDSON,<br>(11) KATHLEEN M. EISBRENNER,<br>(12) FRANK KEATING,<br>(13) BREENE M. KERR,<br>(14) CHARLES T. MAXWELL,<br>(15) DON NICKLES, and<br>(16) FREDERICK B. WHITTEMORE,<br><br>Defendants,<br><br>and<br><br>(17) CHESAPEAKE ENERGY CORPORATION,<br><br>Nominal Defendant. | Case No. CIV-12-743-HE<br><br>**JURY TRIAL DEMANDED** |

## SHAREHOLDER DERIVATIVE COMPLAINT

This is a shareholder derivative action brought by plaintiff Timothy Poh ("Plaintiff") for the benefit of nominal defendant Chesapeake Energy Corporation ("Chesapeake" or the "Company") against certain current and/or former members of Chesapeake's board of directors

(the "Board") and Chesapeake's chief executive (collectively, "Defendants") for breaches of their fiduciary duties owed to Chesapeake and its shareholders.  Defendants breached their fiduciary duties by allowing Aubrey K. McClendon ("McClendon"), co-founder, Chief Executive Officer, and, until recently, Chairman of the Board of Chesapeake, to run the Company for his own benefit at the expense of Chesapeake's shareholders.  The allegations in this shareholder derivative complaint (the "Complaint") are made upon Plaintiff's personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, among other things, the investigation by counsel retained by Plaintiff, including a review of publicly available information, Securities and Exchange Commission ("SEC") filings by Chesapeake, media reports about Chesapeake, and Company reports.

## INTRODUCTION

1.    Chesapeake's public filings boast that the Company is the second-largest producer of natural gas, a top 15 producer of oil and natural gas liquids, and the most active driller of new wells in the United States.  Chesapeake owns interests in approximately 45,700 natural gas and oil wells that are currently producing approximately 3.5 billion cubic feet of natural gas equivalent per day, net to its interest.  Chesapeake's business strategy is focused on discovering and developing a large natural gas resource base.  Chesapeake has also vertically integrated many of its operations and owns substantial marketing, compression, midstream and oilfield services businesses.

2.    Chesapeake's Founder Well Participation Program (the "FWPP") granted McClendon the option to receive a 2.5 percent stake in the profits of every well the Company drilled during the year he opted to participate, in exchange for the McClendon paying 2.5 percent of the costs of those wells.  This incentive scheme is unique among large publicly-traded energy companies, and was structured to be very beneficial for McClendon.

3.     On April 18, 2012, *Reuters* published an article revealing that McClendon used his FWPP stake in Company wells to secure as much as **$1.1 billion** in personal loans. *See* Anna Driver and Brian Grow, "Chesapeake CEO took $1.1 billion in shrouded personal loans," *Reuters* (April 18, 2012), *available at*: http://www.reuters.com/article/2012/04/18/us-chesapeake-mcclendon-loans-idUSBRE83H0GA20120418 (last visited May 4, 2012) (the "*Reuters* Special Report"). In breach of their fiduciary duties owed to Chesapeake, Defendants never disclosed these loans to the Company's shareholders and the public. The *Reuters* Special Report indicates that clauses in McClendon's loans incentivized McClendon to act in the interest of his lenders, instead of Chesapeake and its shareholders, to whom McClendon owes fiduciary duties. In response to the revelations in the *Reuters* Special Report, Standard & Poor's cut Chesapeake's debt rating, **citing "shortcomings" in corporate governance.**

4.     With gas prices currently at decade lows, Chesapeake has been scrambling to shed more than $10 billion in debt through the quick sale of assets. Analysts have estimated that the Company's cash shortage is as high as $6 billion and may reach $22 billion by the end of 2013. In two sales of preferred shares of newly formed entities, in November 2011 and April 2012, Chesapeake raised $2.5 billion from EIG Global Energy Partners ("EIG") and other investors. These investments are extremely favorable to the preferred share purchasers, as dividends on preferred shares are paid before dividends to common stock holders. EIG, on of the preferred share purchasers benefitting from the favorable terms, is also McClendon's largest personal lender. McClendon's private dealings with EIG undoubtedly raise a serious conflict of interest. *See Reuters* Special Report; *see also* Anna Driver and Brian Grow, "McClendon lender struck lucrative deal with CEO," *Reuters* (April 18, 2012), *available at*: http://www.reuters.com/article/2012/04/18/us-chesapeake-mcclendon-sidebar-idUSBRE83H0HB20120418 (last visited May 4, 2012) ("Lucrative Deal").

5.      *Forbes* described the Company's response to *Reuters'* inquires as "not only disingenuous," but "borderline delusional."   Francine McKenna, "Chesapeake Energy: CEO McClendon   Serves   Himself   First,"   *Forbes*   (April   18,   2012),   *available   at*: http://www.forbes.com/sites/francinemckenna/2012/04/18/chesapeake-energy-ceo-mcclendon-serves-himself-first (last visited May 4, 2012) ("Serves Himself First").

6.      Upon the release of the *Reuters* Special Report, Chesapeake's Board claimed that it was "fully aware" of McClendon's loans.   Ernest Scheyder and Matt Daily, "SEC beings probe of   Chesapeake   CEO's   well   stakes,"   *Reuters*   (April   26,   2012),   *available   at*: http://finance.yahoo.com/news/chesapeake-halt-ceos-well-ownership-125149498.html          (last visited May 4, 2012).   Just a week later, however, Defendants admitted that they were unaware of the details of the loans.   *Id.*   This fact exemplifies the free reign that the Board has given McClendon, in contravention of their fiduciary duties.

7.      On May 2, 2012, *Reuters* reported that McClendon was allowed to run a $200 million hedge fund, Heritage Management Company LLC ("Heritage Management"), inside of Chesapeake, at least from 2004 to 2008.   Heritage Management was started by McClendon and Chesapeake co-founder Tom Ward, who left Chesapeake in 2006.   The hedge fund was registered in Delaware in 2004 by Corporation Trust Company, a firm that helps companies incorporate.   Heritage Management traded in the same commodities Chesapeake produces and listed Chesapeake's headquarters as its mailing address.   In fact, when *Reuters* called the phone number listed for Heritage Management, the call was answered "Chesapeake Energy" by a person who said she had not even heard of the fund.   Its staff included an accountant, John D. Garrison, who was simultaneously employed as executive business manager by Chesapeake. Garrison is listed as Heritage Management's chief financial officer.   The hedge fund earned McClendon and Ward management fees and a cut of profits from outside investors.   Heritage

Management presented yet another conflict of interest for McClendon, as there was a significant risk that McClendon's decisions for Chesapeake could be affected by Heritage Management's investments. McClendon also possessed information regarding Chesapeake's trading plans and could trade ahead of the Company, or "front-run," for the benefit of Heritage Management and potentially to the detriment of Chesapeake and its shareholders. *See* Joshua Schneyer, Jeanine Prezioso and David Sheppard, "Special Report: Inside Chesapeake, CEO ran $200 million hedge fund," *Reuters* (May 2, 2012), *available at*: http://www.reuters.com/article/2012/05/02/us-chesapeake-mcclendon-hedge-idUSBRE8410GG20120502 (last visited May 4, 2012) ("Inside Hedge Fund").

8.     Analysts said that these disclosures only scratch the surface of problems at the Company. Indeed, on May 10, 2012, *The Wall Street Journal* reported that Chesapeake "has saddled itself with about $1.4 billion of previously unreported liabilities over the next decade through off-balance-sheet financial deals." Russell Gold, "Costly Liabilities Lurk for Gas Giant," *The Wall Street Journal* (May 10, 2012), *available at*: online.wsj.com/article/SB10001424052702304070304577396391732954530.html (last visited May 11, 2012) ("Costly Liabilities Lurk").

9.     On June 25, 2012, *Reuters* released another damning *Special Report* regarding Chesapeake. *Reuters'* investigation found that the Company "plotted with its top competitor to suppress land prices in one of America's most promising oil and gas plays," likely in violation of federal and state laws. Brian Grow, Joshua Schneyer and Janet Roberts, "Special Report: Chesapeake and rival plotted to suppress land prices," *Reuters* (June 25, 2012), *available at*: http://www.reuters.com/article/2012/06/25/us-chesapeake-land-deals-idUSBRE85O0EI20120625 (last visited June 25, 2012) ("Plotted to Suppress Land Prices").

10.     In granting McClendon free reign at Chesapeake, and allowing McClendon to enjoy the personal use of the Company's financial and legal advisors, Defendants breached their fiduciary duties to the Company's shareholders, resulting in damage to the Company.

11.     Due to these activities at the Company, Chesapeake and McClendon now face an SEC investigation, reportedly regarding conflict of interest rules, along with a probe by Ohio's attorney general.

12.     Amid the turmoil, the Board finally voted to remove McClendon as its Chairman. However, McClendon remains the CEO and a director of the Company.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction of this action under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because: (1) one or more Defendants either reside in, or maintain executive offices in this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred within this District; and (3)

Defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

## THE PARTIES

### Plaintiff

17.     Plaintiff, Timothy Poh, is a current shareholder of the Company, was a shareholder at the time of the misconduct complained of herein, and intends to continue to hold Chesapeake shares at least through the resolution of this action.

### The Nominal Corporate Defendant

18.     Nominal defendant Chesapeake Energy Corporation is an Oklahoma corporation with headquarters located at 6100 North Western Avenue, Oklahoma City, Oklahoma. Chesapeake securities are registered with the SEC under Section 12(b) of the Exchange Act and its common stock trades on the New York Stock Exchange under the symbol "CHK."

### The Board of Directors

19.     Chesapeake's Board maintains three standing committees on which its directors serve – the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

20.     Defendant Bob G. Alexander ("Alexander") has served as a director of the Company since June 2012.

21.     Defendant Archie W. Dunham ("Dunham") has served as a director of the Company since June 2012.

22.     Defendant V. Burns Hargis ("Hargis") has served as a director of the Company since 2008.  He currently serves as the chairperson of the Audit Committee.  His total director compensation for 2011 was $565,465.  Hargis is the President of Oklahoma State University ("OSU").

23.     Defendant Vincent J. Intrieri ("Intrieri") has served as a director of the Company since June 2012.

24.     Defendant R. Brad Martin ("Martin") has served as a director of the Company since June 2012.

25.     Defendant Aubrey K. McClendon is Chesapeake's Co-Founder and Chief Executive Officer.  He served as a director of the Company since co-founding Chesapeake in 1989 and was Chairman of the Board until being removed from that position after the allegations at issue here surfaced.  His total reported executive compensation for the years 2009-2011 was $57,464,325.

26.     Defendant Merrill A. "Pete" Miller, Jr. ("Miller") has served as a director of the Company since 2007.  He currently serves as a member of the Audit Committee.  His total director compensation for 2011 was $572,709.

27.     Defendant Frederic M. Poses ("Poses") has served as a director of the Company since June 2012.

28.     Defendant Louis A. Simpson ("Simpson") has served as a director of the Company since 2011.  He currently serves as a member of the Nominating and Corporate Governance Committee.  His total director compensation for 2011 was $647,738.

29.     Defendants Alexander, Dunham, Hargis, Intrieri, Martin, McClendon, Miller, Poses and Simpson comprise the current directors on the Board, and are collectively referred to as the "Director Defendants."

**Former Directors**

30.     Defendant Richard K. Davidson ("Davidson") served as a director of the Company from 2006 to 2012.  He most recently served as a member of the Audit Committee.  His total director compensation for 2011 was $590,426.

31.    Defendant Kathleen M. Eisbrenner ("Eisbrenner") served as a director of the Company from 2010 to 2012.  She most recently served as a member of the Compensation Committee.  Her total director compensation for 2011 was $561,805.

32.    Defendant Frank Keating ("Keating") served as a director of the Company from 2003 to 2012.  He most recently served as the chairperson of the Compensation Committee.  His total director compensation for 2011 was $559,232.  Keating was a two-term governor of the State of Oklahoma.

33.    Defendant Breene M. Kerr ("Kerr") served as a director of the Company from 1993 to 2009.  In 2009, he served as the chairman of the Audit Committee.  His total director compensation for 2009 was $712,334.

34.    Defendant Charles T. Maxwell ("Maxwell") served as a director of the Company from 2003 to 2012.  He most recently served as a member of the Compensation Committee.  His total director compensation for 2011 was $386,273.

35.    Defendant Don Nickles ("Nickles") served as a director of the Company from 2005 to 2012.  He most recently served as a member of the Nominating and Corporate Governance Committee.  His total director compensation for 2011 was $569,341.  Nickles was a United States Senator, representing Oklahoma, from 1980 to 2005.

36.    Defendant Frederick B. Whittemore ("Whittemore") served as a director of the Company from 1993 to 2011.  In 2010, he served as a member of the Compensation Committee.  His total director compensation for 2010 was $477,068.

37.    Defendants Davidson, Eisbrenner, Keating, Kerr, Maxwell, Nickles and Whittemore are collectively referred to as the "Former Director Defendants."

**Senior Executive**

38.    Defendant McClendon is also referred to as the "Executive Defendant."

39.     The Director Defendants, Former Director Defendants, and Executive Defendant are collectively referred to as "Defendants."

## FACTUAL BACKGROUND AND ALLEGATIONS

**The Specific Fiduciary Duties of Chesapeake's Management and Board**

40.     Chesapeake's senior management and directors on the Board have fiduciary duties to the Company and its shareholders, including the duties of loyalty and care.  In addition, Chesapeake's corporate documents (such as the "Corporate Governance Principles") expressly detail the requirements of the Board's duties, requiring, among other things, that the Board "responsible for the oversight of the [Company] and its business."  As such, the Board is the ultimate decision-making authority for the Company and must be continuously informed with respect to the Company's important business affairs.  The Corporate Governance Principles require that the Board "act with honesty and integrity in the oversight of the [Company] and holds the [Company's] management to the same standards of conduct."

41.     According to the Company's Code of Business Conduct and Ethics (the "Code"), "[d]irectors, officers and employees of the Company are expected to comply with all applicable laws and to act with honesty and integrity when conducting the Company's business."  The Code acts as a "guide for applying legal and ethical practices to [Chesapeake's employees'] everyday work," explaining "the types of behavior that will help [the] Company meet its commitment to operate on the highest standards of ethical conduct."

42.     According to the Audit Committee's Charter, the purpose of the Audit Committee is to "assist the Board of Directors in overseeing (a) the integrity of the Corporation's financial statements, (b) the Corporation's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence, and (d) the performance of the Corporation's internal auditor and independent auditor."

43.    The Nominating and Corporate Governance Committee is also specifically charged with "[d]evelop[ing], periodically review[ing] and recommend[ing] to the Board a set of corporate governance principles applicable to the [Company] and mak[ing] recommendations to the Board regarding corporate governance matters and practices."   The Nominating and Corporate Governance Committee must also "[o]versee and evaluate compliance by the Board and management with the [Company]'s corporate governance principles and its Code of Business Conduct and Ethics.

44.    Defendants' misconduct related to allowing McClendon to run the Chesapeake for his own benefit, to the detriment of shareholders, including allowing McClendon to obtain suspect personal loans and to run an internal hedge fund, is completely inconsistent with the fiduciary duties that all Chesapeake directors and senior management undertake as a condition to accepting their positions with the Company.

**McClendon's Suspicious Loans Come to Light**

45.    The FWPP, grants McClendon the option to receive a 2.5 percent stake in the profits of every well the Company drills during the year the McClendon opts to participate, in exchange for the paying 2.5 percent of the costs of those wells.   This incentive scheme gives McClendon the opportunity to profit handsomely.

46.    "Chesapeake is the only large publicly traded energy company to grant its CEO the opportunity to take a direct stake in wells it drills." *Reuters* Special Report.

47.    Chesapeake claims that the FWPP aligns McClendon's interests with those of the company, by "foster[ing] and promot[ing] the development and execution of the Company's business by...imposing on the Founders the same risk incurred by the Company in its core operations."   In reality, however, McClendon's interests are not aligned with those of Chesapeake.

48.    The FWPP gave McClendon the right to participate in wells drilled by Chesapeake without any of the upfront costs incurred by the Company.  As noted by *Forbes*:

> [T]he FWPP does **not** align McClendon's interests with shareholders because it requires only that McClendon pay his 2.5% share of costs on the wells that Chesapeake drills; it does not make McClendon pay anything towards the billions of dollars that the company has sunk into acquiring acreage that it may never drill at all.
>
> This matters because Chesapeake only drills on portions of its acreage that it has determined are the "sweet spots" likely to hold the most oil and gas. Acreage that holds these sweet spots is worth multiples more than less attractive surrounding acreage.

Christopher Helman, "Chesapeake Board Yanks McClendon's Chairman Title, But Big Questions And Conflicts Remain," *Forbes* (May 1, 2012), *available at*: http://www.forbes.com/sites/christopherhelman/2012/05/01/chesapeake-board-yanks-mcclendons-chairman-title-but-big-questions-and-conflicts-remain (last visited May 6, 2012).

49.    As pointed out in a recent report, the FWPP is "highly susceptible to conflicts of interests and a diversion to the CEO's attention – not to mention the added kicker of a highly leveraged asset based on a historically volatile commodity."  In short, "[t]his was a powder keg of poor governance and poor risk management waiting to ignite."  Matt Orsagh, "Chesapeake Energy: Investors Fume Over Pattern Of Poor Corporate Governance," *Seeking Alpha* (May 6, 2012), *available at*: http://seekingalpha.com/article/563691-chesapeake-energy-investors-fume-over-pattern-of-poor-corporate-governance (last visited May 7, 2012).

50.    On April 18, 2012, the *Reuters* Special Report exposed for the first time the fact that defendant McClendon used his FWPP stake in Company wells to secure as much as **$1.1 billion** in questionable personal loans.

51.    During the last three years, McClendon has taken out the following loans:

In June 2009, McClendon agreed to borrow up to $225 million from Union Bank, a California lender, pledging his share of wells as collateral.

In December 2010, he borrowed $375 million from TCW Asset Management, a private equity firm.

And in January 2012, McClendon borrowed $500 million from a unit of EIG Global Energy Partners, a private equity firm formed by former TCW executives.

*Reuters* Special Report.

52.     According to *Reuters*, "because McClendon is using the loans to finance his participation in the well plan, he defrays his risks." *Reuters* Special Report.  If the wells were not producing enough for McClendon to cover his loan payments, McClendon would only lose is his 2.5 percent stake in those non-producing wells.  Since McClendon incurred no risk in a failed well, he was incentivized to drill as many wells as possible – which is what Chesapeake has done – regardless of whether the drilling was in Chesapeake's best interests.  An analyst with Morningstar in Chicago asked, "[i]f [McClendon] hasn't had to put up any of his own money, how is that alignment?"

53.     The number, amounts or terms of these loans were never disclosed to Chesapeake's shareholders and the public, despite the fact that the financial arrangements likely compromise McClendon's fiduciary duties to the Company's investors, as the loans could incentivize McClendon to act in the interest of his lenders.  Indeed, even veteran analysts of the Company said they were never aware of the loans until contacted by *Reuters*.

**Chesapeake Borrows from McClendon's Largest Personal Lender**

54.     McClendon's largest lender, EIG Global Energy Partners ("EIG"), from which McClendon borrowed $500 million, has also been a significant provider of capital to Chesapeake.

55.     According to the *Reuters* Special Report:

In November, Chesapeake raised $1.25 billion from a group of investors including EIG through the sale of "perpetual preferred shares" in a newly formed

entity, Chesapeake Utica LLC, which controls about 800,000 acres of oil and gas-rich land in Ohio. The sale offers lucrative terms to EIG investors, paying an annual dividend of 7 percent and royalty interests from oil and gas wells, according to analysts.

On April 9, the company announced a nearly identical deal to raise another $1.25 billion from EIG and other investors, in another new subsidiary called CHK Cleveland Tonkawa.

56.     Significantly, "[d]ividends on preferred shares are controversial because they are paid before regular dividends owed to common shareholders." *Reuters* Special Report.

57.     Wall Street analysts have called for more information about McClendon's loans as his largest personal lender received favorable terms on its Chesapeake investments.

58.     Even Chesapeake's general counsel Henry Hood, who has offered many unsupportable denials to *Reuters*, acknowledged there is the possibility of a conflict of interest with the Company and its CEO borrowing from the same lender.

59.     In response to the revelations in the *Reuters* Special Report, Standard & Poor's cut Chesapeake's debt rating, **citing "shortcomings" in corporate governance**.

**McClendon Ran a Hedge Fund from Inside Chesapeake**

60.     Perhaps just as surprising as McClendon's suspect loans is the fact that McClendon, along with Chesapeake co-founder Tom Ward (who left Chesapeake in 2006), was permitted to run Heritage Management inside of Chesapeake. The $200 million hedge fund listed Chesapeake's headquarters as its mailing address and its staff included an accountant who was simultaneously employed by Chesapeake.

61.     Heritage Management, which operated at least in the years 2004-2008, traded in the same commodities Chesapeake produces.

62.     This presented yet another conflict of interest for McClendon, as there was a significant risk that McClendon's decisions for Chesapeake could be affected by Heritage

Management's investment positions.  As pointed out by the former chief economist at the Commodity Futures Trading Commission, "[i]f the company needs to make an operating decision which might move the market against the CEO's positions, there's a risk that will influence the decision-making at the top of the company."  *See* Inside Hedge Fund.

63.     McClendon also possessed information regarding Chesapeake's trading plans and could trade ahead of the Company, or "front-run," for the benefit of Heritage Management and potentially to the detriment of Chesapeake and its shareholders.  An oil and gas industry analyst at Sterne Agee in New York commented that "[a]dvance knowledge of Chesapeake's activities could be perceived as having insight into the movement of commodities prices, which certainly raises conflict-of-interest issues as well as ethical issues about the ability to enrich himself on non-public information."

64.     The former head of trading-compliance at Texaco observed that "an executive's first responsibility is to shareholders and the betterment of their investment.  Personal trading in the commodity around which the CEO's business is based would be a clear no.  We would never have tolerated that, ever."

65.     For these reasons and more, personal dealing in energy markets is typically forbidden by oil and gas companies.

**The Board Previously Granted McClendon a Vast Windfall**

66.     Chesapeake's Board has taken affirmative steps in the past to assist McClendon, at the expense of the Company's shareholders.

67.     In 2008, Chesapeake's Board provided cash-strapped McClendon with an $87 million bailout, granting him a $75 million bonus (quintupling his salary) and paying him $12.1 million for a collection of maps.  This action occurred in a year where the Company's earnings were cut in half, and caused a 60% drop in Chesapeake's stock price.

68.    In settling a lawsuit related to this dubious conduct, the Board agreed to adopt rigorous governance reforms, including mandating the use of independent compensation consultants, with hopes that similar Board missteps would be avoided.

69.    The lawsuit and the terms of the settlement certainly put the Board on notice that it could not continue to indulge McClendon.

**McClendon Benefitted from Using Chesapeake's Banks and Financial and Legal Advisors**

70.    According to *The Wall Street Journal*, "several major Wall Street banks have lent [McClendon] money and then received lucrative work as public-offering underwriters or financial advisers to Chesapeake." *See* Russell Gold, "Board Turns on Chesapeake's CEO," *The Wall Street Journal* (April 26, 2012), *available at*: online.wsj.com/article/SB10001424052702304811304577367750138370694.html (last visited May 7, 2012).  These banks and financial powerhouses include Wachovia/Wells Fargo, Bank of America, Goldman Sachs, and Centaurus Capital LLC ("Centaurus").

71.    In 2008, both Chesapeake and McClendon used the same Wachovia (now Wells Fargo) bankers for volumetric production payment ("VPP") transactions.  VPPs are one of the main ways Chesapeake addresses gaps between its cash flow and capital spending.  The transactions are a type of forward commodity sale that require the Company to deliver a certain amount of gas or oil over a given period of time, in exchange for up-front cash.  Common buyers of VPPs are investment banks, hedge funds, energy companies and insurance companies, among others.

72.    McClendon's Wachovia deals in 2008 yielded him over $130 million, while the Company's August 2008 deal was worth $600 million.  Wachovia/Wells Fargo has served as a financial adviser to Chesapeake on ten transactions valued at nearly $10 billion combined since 2005.  The company extended another loan to McClendon in 2010.  The fact that both

McClendon and Chesapeake used the same bankers at Wachovia/Wells Fargo is troubling, as parties such as Wachovia/Wells Fargo are incentivized to give McClendon a better deal in order to secure Chesapeake's business. *See* Zachary R. Mider, "McClendon Used Wachovia in Personal Sale After Chesapeake," *Bloomberg* (May 3, 2012), *available at*: http://www.bloomberg.com/news/2012-05-03/mcclendon-used-wachovia-in-personal-sale-after-chesapeake.html (last visited May 7, 2012) ("McClendon Used Wachovia")

73.     McClendon has also been a debtor in recent years to both Bank of America and Goldman Sachs. These two firms are currently handling the initial public offering of a Company subsidiary -- Chesapeake Oilfield Services Inc.

74.     McClendon has borrowed from other entities and has further lengthened his list of conflicts. In 2008, McClendon was also listed as a debtor to Centaurus, a Houston, Texas hedge fund that is involved in oil and natural-gas hedging. And in 2009, McClendon borrowed money from George Kaiser ("Kaiser"), a Tulsa-based billionaire investor with significant bank and energy holdings. Defendant Hargis, a member of Chesapeake's Board, also serves on the board of BOK Financial Corp., which is controlled by Kaiser.

75.     Additionally, McClendon has availed himself of Chesapeake's executives, financial advisors and lawyers in his personal transactions. McClendon has benefitted from outside legal counsel from Commercial Law Group, PC and financial advice from Jeffries Group Inc. Further, Doug Jacobson, an executive vice president of Chesapeake, is an officer of one of McClendon's personal companies.

**VPPs and McClendon's Further Breach of the Duty of Loyalty**

76.     In a VPP, the seller sells a specific volume of unproduced gas or oil in the ground under a specified lease or pool of leases. The buyer becomes the owner of the gas or oil in the

ground, thus owning a real property interest, and is entitled to receive a stated monthly quota – usually in raw output, free of any costs, which is then marketed by the VPP buyer.

77.    One of the advantages of a VPP is that VPP transactions typically remain off the parties' balance sheets.

78.    Chesapeake has raised $6.4 billion through ten VPPs arranged since December 2007.  Recently, the Company agreed to sell Morgan Stanley ten years of future gas output from the Granite Wash for nearly $750 million.

79.    Chesapeake has used the VPPs to generate substantial operating capital and acquisition funding off the books without borrowing money by using traditional debt or issuing additional capital stock, thus concealing the Company's actual future liabilities.  Analyst Philip Weiss noted that the VPPs demonstrate that the Company "continues to rely largely on financial engineering transactions to raise cash." *See* Joe Carroll, "Chesapeake 22% Decline Seen Spurred by   Personal   Conflict,"   *Bloomberg*   (April   23,   2012),   *available   at*: http://www.bloomberg.com/news/2012-04-22/chesapeake-25-decline-seen-spurred-by-personal-conflict.html (last visited May 7, 2012).

80.    The *Wall Street Journal* calculated that these VPPs have saddled Chesapeake with approximately $1.4 billion of previously unreported liabilities over the next decade, including nearly $600 million in 2012 and 2013 alone.  *See* Costly Liabilities Lurk.

81.    On information and belief, McClendon entered into self-serving investments using VPPs, which paid him millions of dollars of income flow that otherwise would have gone to Chesapeake.

**Early Termination of the FWPP and Removal of McClendon as Chairman**

82.    On May 1, 2012, the Company announced that its Board had renegotiated the terms of the FWPP with McClendon.  The FWPP's 10-year term was scheduled to end on

December 31, 2015, but McClendon and the Board agreed to end it 18 months earlier, on June 30, 2014 – a date that is still two years into the future.

83.     Additionally, the Board removed McClendon from the role of Chairman and committed to appoint a new chairman with no ties to the Company.  The Board, however, allowed McClendon to retain his position as Chief Executive Officer of the Company.

84.     Unfortunately for Chesapeake's shareholders, these maneuvers present a prototypical case of "too little, too late."

**The SEC Investigates Chesapeake and McClendon**

85.     On May 3, 2012, Chesapeake announced that the SEC was investigating the Company and McClendon.  Chesapeake and McClendon both have been asked to retain certain documents.  Although the Company has not specified what matters the regulators are examining, *Bloomberg* reported that federal investigators are looking at whether McClendon violated conflict of interest rules.

**Chesapeake Colluded with its Canadian Rival**

86.     In another shocking article, on June 25, 2012, *Reuters* reported that Chesapeake colluded with Canada's largest natural gas company, Encana Corporation ("Encana"), "to avoid bidding against each other in a public land auction in Michigan [in 2010] and in at least nine prospective deals with private land owners."  *See* Plotted to Suppress Land Prices.

87.     *Reuters* reviewed at least a dozen email exchanges within the Company that evidenced potential violations of federal and state laws.  When presented with these emails, a former antitrust attorney for the United States Department of Justice commented, "[t]he famous phrase is a 'smoking gun.'  That's a smoking H-bomb."

88.     According to *Reuters*, the allegations of collusion could be even more damaging to Chesapeake than the other issues brought to light in the previous two months, as "[c]ompanies

can be fined up to $100 million and individuals up to $1 million for each offense....Victims of bid-rigging can also seek triple the amount of damages."

89.     In response to *Reuters*, Encana stated that it could not specifically address *Reuters'* questions and has commenced an internal investigation into the allegations.   The *Reuters* report does not indicate that Chesapeake has undertaken an internal investigation of their own.

## DEFENDANTS CONCEALED THEIR WRONGDOING FROM CHESAPEAKE SHAREHOLDERS

90.     Defendants concealed the facts pertaining to McClendon's suspect personal loans and conflicted hedge fund McClendon ran from inside Chesapeake's headquarters.   Misleading investors and the public at large, Chesapeake's annual reports and proxy statements have never mentioned any of the loans.   Defendants drafted, approved, reviewed and/or signed the annual reports and proxy statements before they were filed with the SEC and disseminated to Chesapeake shareholders.   Defendants knew, or were deliberately reckless in not knowing, that the annual reports and proxy statements were materially false and misleading.

## DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE

91.     Plaintiff brings this action derivatively in the right and for the benefit of Chesapeake to redress the breaches of fiduciary duty and other violations of law by Defendants as alleged herein.

92.     Plaintiff will adequately and fairly represent the interests of Chesapeake and its shareholders in enforcing and prosecuting their rights, and he has retained counsel experienced in prosecuting this type of action.

93.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

94.    At the time this action was initiated, the Board was comprised of nine (9) directors: defendants Alexander, Dunham, Hargis, Intrieri, Martin, McClendon, Miller, Poses and Simpson (defined earlier as the "Director Defendants").    Plaintiff did not issue a demand upon the Director Defendants prior to instituting this action because several of the Director Defendants either: (a) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand; and/or (b) engaged in conduct that is not a legitimate exercise of judgment and/or is *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule, thus rendering a demand useless.

**Demand is Excused Because Several Current Board Members are Conflicted**

95.    Demand is futile and excused because several members of the current Board, including McClendon himself, are not disinterested or independent and cannot, therefore, properly consider or investigate any demand to prosecute this action.

96.     These Defendants were required to act upon this information to protect the Company from McClendon's actions.  Rather than acting, these Defendants, in violation of their fiduciary duties, gave McClendon free reign.  To the extent that some of the defendants did not know of the McClendon's illicit loans or hedge fund, it is as a result of their own fiduciary failures.  Defendants were responsible for acting with honesty and integrity in the oversight of the Chesapeake and holding the Company's management to the same standards of conduct.

97.    The current Board is fraught with conflict and is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

98.    Defendant McClendon was involved in all of the actions at issue here.  Thus, there is no doubt that McClendon is interested and conflicted.

99.     Defendant Hargis is President of OSU, a state institution to which Chesapeake makes large contributions.  Hargis earns more for his service on the Chesapeake Board than he does in his full-time job.  Hargis, therefore, is interested and conflicted.

100.     Defendant Miller is the Chairman, President and CEO of National Oilwell Varco, Inc. ("NOV").  NOV, whose roots date back to 1841, is a supplier of oilfield services, equipment and components to the worldwide oil and natural gas industry.  NOV boasts that it is a worldwide leader in providing major mechanical components for land and offshore drilling rigs, complete land drilling and well servicing rigs, and a broad offering of other drilling equipment and tools.  Chesapeake has a business relationship with NOV, having purchased oilfield equipment and services from NOV.  Before joining NOV, Miller was President of Anadarko Drilling Company, a company that Chesapeake helped form.  Despite Miller's ironic title, "lead independent director," Miller is interested and conflicted.

101.     Additionally, each member of the Audit Committee – including at least Defendants Hargis and Miller – is conflicted since they were charged with overseeing the integrity of the Chesapeake's financial statements, which failed to disclose either McClendon's loans or McClendon's hedge fund to the Company's shareholders.

102.     The Nominating and Corporate Governance Committee members – including at least Defendant Simpson – are interested and conflicted because of the corporate governance failures exhibited by the actions at issue here.

103.     Given the prior track record of the Board, and the fact that Defendants McClendon, Hargis, Miller and Simpson remain on the Board, there can be no confidence that any of the new directors would properly consider or investigate a demand.

104.     As a result of these considerable conflicts, demand is futile and excused.

**Demand is Excused Because the Director Defendants' and Former Director Defendants' Conduct is Not a Valid Exercise of Business Judgment**

105.    The Director Defendants' and Former Director Defendants' challenged misconduct at the heart of this case represents a breach of the duty of loyalty, outside the scope of business judgment.

106.    Simply put, allowing McClendon to take out massive loans, backed by his interest in a suspicious incentive program, and to operate a hedge fund within the Company – both of which presented serious conflicts of interest between Chesapeake and its chief executive – cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance or misfeasance. Nor can such malfeasance or misfeasance ever constitute the "good faith" required of corporate fiduciaries.

107.    Many of the current members of the Board served as directors while the illicit loans were secured, while the hedge fund was in operation, and during the time that Chesapeake's filings failed to disclose these matters. As such, they had an obligation to prohibit these activities. Their decision not to do so cannot be regarded as a valid exercise of business judgment.

108.    Certain former members of the Board, including Former Director Defendants Keating and Nickles, have conflicts that may have contributed to the breaches of their duty of loyalty. Defendant Keating has two family members employed at Chesapeake, each drawing a significant salary. His son, Chip Keating, is a Real Estate Negotiator at the Company. Keating, therefore, is interested and conflicted. Defendants Keating and Nickles are also interested and conflicted because of their political connections to Chesapeake. Both Republicans, Keating was a two-term governor of the State of Oklahoma and Nickles was a United States Senator,

representing Oklahoma, from 1980 to 2005. Chesapeake is a significant Republican benefactor, as the party is supportive of its natural gas exploration practices.

109.    There is no legitimate "business judgment" involved in permitting an executive to enter into suspect personal loans and operate a hedge fund within the Company's walls. Accordingly, demand on the Board is futile and excused.

**COUNT I**

**DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY**

**(Against all Defendants)**

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    The Defendants all owed and owe fiduciary duties to Chesapeake and its shareholders. By reason of their fiduciary relationships, Defendants specifically owed and owe Chesapeake the highest obligation of loyalty and due care in the administration of the affairs of Chesapeake. Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

112.    The Defendants consciously breached their corporate duties and responsibilities as stated herein.

113.    As a direct and proximate result of the Defendants' conscious failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

114.    Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

115.    Determining that this action is a proper derivative action maintainable under law and demand is excused;

116.    Awarding, against all Defendants and in favor of Chesapeake, the damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

117.    Enjoining Defendants from further violating their fiduciary duties as described herein;

118.    Awarding to Chesapeake restitution from Defendants, and from each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

119.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

120.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 29, 2012.

DERRYBERRY & NAIFEH, LLP
DARREN B. DERRYBERRY

s/ Darren B. Derryberry, OBA No. 14542
4800 North Lincoln Boulevard
Oklahoma City, OK  73105
Tel: (405) 528-6569
Fax: (405) 528-6462
dderryberry@derryberrylaw.com

BERGER & MONTAGUE, P.C.
Lawrence Deutsch
Robin Switzenbaum
Jacob M. Polakoff
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ldeutsch@bm.net

*Attorneys for Plaintiff*

## VERIFICATION

I, Timothy Poh, hereby declare and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am a shareholder of Chesapeake Energy Corporation, and was a shareholder of Chesapeake Energy Corporation at the time of the misconduct complained of in the Shareholder Derivative Complaint (the "Complaint"), having initially purchased shares of Chesapeake Energy Corporation on November 15, 2011. I have read and reviewed the Complaint and know the contents thereof, except as to the matters therein stated to be alleged on information and belief; and as to those matters I believe them to be true and correct. I have authorized the filing of the Complaint and declare that the foregoing is true and correct.

Executed this 26th day of June, 2012, at 9 Beech Hill Rd., Wrentham, NH 02353

_____
Timothy Poh